### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| CRAIG CHIVERS and | ) | |
| ALICIA MICHELLE CHIVERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:04-CV-394-TS |
| | ) | |
| CENTRAL NOBLE COMMUNITY | ) | |
| SCHOOLS AND ITS EMPLOYEES, | ) | |
| GERALD WELLMAN and | ) | |
| BRIAN GILLESPIE, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

The Plaintiffs, Craig Chivers and Alicia Michelle Chivers, sued Central Noble Community Schools (the "School") and high school principal Gerald Wellman ("Wellman") in his official capacity for creating a sexually hostile environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). The Plaintiffs also asserted claims against the School and Wellman for negligent hire, retention, and supervision (Count II). The Plaintiffs added teacher Brian Gillespie ("Gillespie") as a defendant to their claims of intentional infliction of emotional distress (Count III) and loss of consortium (Count IV).

In a separate cause number, 1:05-CV-263, which was consolidated with this case, Alicia Michelle Chivers alleged that Gillespie violated 42 U.S.C. § 1983 when he sexually harassed her and created a sexually hostile education environment in violation of her constitutional right to equal protection.

This matter is before the Court on motions for summary judgment filed by the School and Wellman [DE 61] on September 29, 2005, and by Gillespie [DE 63] on September 30, 2005. Also

before the Court is Gillespie's Motion to Strike [DE 77] one of the Plaintiffs' exhibits filed in opposition to summary judgment.

## PROCEDURAL BACKGROUND

On October 21, 2004, Craig Chivers, individually and as parent and next friend of Alicia Michelle Chivers, filed a Complaint against the School and its employees, Wellman and Gillespie, for damages under Title IX. The Complaint alleged that the Defendants discriminated against Chivers on the basis of her sex when Gillespie sexually harassed her and Wellman and the School were deliberately indifferent to the harassment. The Complaint also set forth claims for negligent hire, retention, and supervision against Wellman and the School and for intentional infliction of emotional distress and loss of consortium against all the Defendants. On December 13, 2004, Gillespie filed his Answer, as did Wellman and the School.

On December 17, 2004, Gillespie filed a Motion for Judgment on the Pleadings arguing that Title IX does not authorize a suit against an individual, but only against a program or activity that receives federal funding. In response, the Plaintiff filed a Motion to Amend Complaint. On January 19, 2005, the Plaintiff's Amended Complaint was filed adding Michelle Chivers, who had turned eighteen since the filing of the original complaint, as a Plaintiff and clarifying the claims against the Defendants. The Plaintiff clarified that its Title IX case was against the School and against Wellman in his official capacity, not against Gillespie.

On January 31, 2005, Gillespie answered the Amended Complaint. On June 6, the School and Wellman answered. On July 21, the Plaintiffs moved to again amend their Complaint to add a claim under § 1983 against Gillespie. The Defendant opposed the Motion and on July 25, the Court

denied the Plaintiffs' Motion to Amend their Complaint. On August 2, 2005, Alicia Michelle Chivers filed a § 1983 Complaint in Cause Number 1:05-CV-263 against Gillespie for sexually harassing her and depriving her of her constitutionally protected right to equal protection. On September 16, that case was consolidated with the Plaintiffs' previously filed case against the School, Wellman, and Gillespie.

On September 22, Gillespie moved to amend his Answer to assert the defense of qualified immunity and on October 12 the Motion was granted. On September 29, the School and Wellman moved for summary judgment and on September 30, Gillespie also moved for summary judgment. On November 10, the Plaintiffs responded to the motions for summary judgment and on November 28, the School and Wellman replied. On December 5, Gillespie replied and also filed a Rule 56 Motion to Strike one of the Plaintiffs' exhibits. The Motion to Strike was fully briefed on December 14.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are

no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

## MOTION TO STRIKE

In response to Gillespie's Motion for Summary Judgment, Chivers submitted Exhibit 16 to her deposition. Exhibit 16 is a summary Chivers prepared describing some of Gillespie's conduct that she believed to be inappropriate. Chivers wrote the summary in response to Principal Wellman's request to provide a written account of the events that she first complained to him of on October 6, 2003. Chivers provided this summary to Wellman on or about October 10, 2003.

Gillespie moves to strike the summary, arguing that it is: (1) inadmissible hearsay; (2) an

4

unsworn statement; (3) unauthenticated; and (4) speculative. Chivers responds that there is sufficient evidence before the Court that identifies and authenticates the summary. She notes that Exhibit 28 to the School and Wellman's Motion for Summary Judgment is the same summary that Gillespie moves to strike from her submissions. She also submits that Gillespie has attached a transcript of Chivers's unsworn testimony to the Indiana State Police and Noble County Prosecutor, which includes Chivers's testimony about the same incidents she cited in the summary. Chivers also asserts that she answered questions, during her deposition and while under oath, regarding the incidents set forth in the summary. Additionally, the Plaintiff supplements the record with her Affidavit, which she claims she would have filed with her Statement of Genuine Issues had the School and Wellman not already submitted Chivers's summary as part of its evidence in support of summary judgment. In her Affidavit, Chivers states that the summary is a true and accurate statement of conversations Gillespie had with her before she complained to Wellman. Chivers also clarifies her perception of some of the events described in the summary.

### A.     Hearsay

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Federal Rule of Evidence 802 generally bars the admission of hearsay (a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted). However, Rule 801 defines some statements as non-hearsay, and Rules 803 and 804 list exceptions to the hearsay rule.

The summary, which contains Gillespie's purported statements to Chivers, is not hearsay.

First, the statements contained in the summary are not offered for the truth of the matters asserted; they are offered as evidence of what Gillespie said, not whether what he said was true. Second, the statements were made by Gillespie himself, a party to the lawsuit. *See* Fed. R. Evid. 801(d)(2) (admission by party-opponent is not hearsay).

**B.     Sworn Statements and Authentication**

The summary, although itself not a sworn statement, was attached to Chivers's deposition. Chivers's deposition testimony was given under oath. In addition, Chivers authenticated the summary with her Affidavit. Nevertheless, still pressing his argument to strike the summary, Gillespie contends that it was not authenticated by materials specifically designated by Chivers in her Statement of Genuine Issues, as required by Local Rule 56.1 and that Chivers's Affidavit was not timely and must also be stricken.

Although it is true that Chivers did not designate the evidentiary materials that authenticate Exhibit 16, this evidence was subsequently brought to the Court's attention in response to the Motion to Strike. In response to the Motion to Strike, Chivers cited to specific pages of her deposition and presented an Affidavit. Thus, the Court is not required to scour the record, an entire deposition, or other lengthy exhibit to find the evidence that authenticates the summary. In addition, it is this Court's experience that in summary judgment practice, it is not unusual for parties to submit unauthenticated documents, especially where the side offering them has no reason to expect a dispute over authenticity. If an objection is raised, the offering party often tries to cure the problem with a supplemental affidavit. Here, Chivers did not expect a dispute over authentication because the other Defendants, the School and Wellman, already submitted Exhibit 16 in support of their own

6

Motion for Summary Judgment. When Gillespie did challenge the Exhibit, Chivers filed the appropriate affidavit. For all the above reasons, and because Gillespie has had fair opportunity to respond to the evidence and argue the merits of Exhibit 16's admissibility, the Court declines to strike the Affidavit as untimely and finds that Exhibit 16 has been authenticated.

## C.      Speculation

Gillespie's challenge to the admissibility of the Exhibit on the grounds that it, by its own language, is speculative, also fails. Chivers's summary provides the screen names that Gillespie used, "remembered as accurately as possible." Chivers did not speculate as to the screen names Gillespie may have used, but remembered them as accurately as possible from first hand experience. This caveat may affect the weight of the evidence, which the Court does not consider on a motion for summary judgment, but it does not render the Exhibit inadmissible.

Gillespie's Motion to Strike is denied and the Court will consider the statements contained in Exhibit 16 to Chivers's deposition.

## STATEMENT OF FACTS

In Fall 2003, Alicia Chivers was a seventeen-year-old junior at Central Noble High School. Her parents, Craig and Sandra Chivers, were divorced and Chivers was living with her father. Gillespie was a thirty-two-year-old math teacher and the boys' tennis coach at the School. Chivers was in Gillespie's trigonometry class during the 2003 fall semester and was also the manager of the tennis team coached by Gillespie.

In September, Chivers sent Gillespie an e-mail to tell him that she could not attend a tennis

match because of a conflict with her job. After this e-mail, Chivers and Gillespie began having instant message (IM) conversations every day, or every other day, using their personal computers.[1] The content of these messages, which will be discussed later, forms the basis of Chivers's claims that Gillespie sexually harassed her.

Chivers contends that Gillespie always initiated the conversations. Although she had the ability to block his messages, and occasionally did when she did not want to talk to him, she did not always do so even though she knew it would just look like she was not online. Chivers testified that she believed Gillespie would think something was wrong if she stopped talking to him. She worried that he would get nervous that he was about to get in trouble because Gillepsie had acknowledged to Chivers many times that his behavior was risky. Gillespie's response would have been important to Chivers because she felt that Gillespie had control over her math grade as well as influence over other students' opinions of her. She had witnessed students' harsh treatment of another student who was sexually harassed by a teacher and believed the same could happen to her because Gillespie was a popular teacher. He also had access to her personal records and information. Chivers did not actually suffer any negative consequences for the times she blocked Gillespie's messages.

Friday, October 3, 2003, was the last day that Chivers attended classes at the School. This was also the earliest date that anyone at the School learned of the events transpiring between Chivers and Gillespie. Mr. Chivers called Wellman, the High School principal, to complain of Gillespie's conduct toward his daughter. Before this, Chivers had told other people, such as her boyfriend and sisters, about Gillespie's comments, but asked them all not to take action. When Chivers told her

_____

[1] Like a chat room, IM is used to send messages back and forth through the Internet to a specific user. It is like a chat room in the way that you can communicate, but unlike most chat room communications, the information that is being typed is sent directly to the user and is not viewed by anyone else. Chivers and Gillespie used MSN as their IM vehicle.

mother about the situation, her mother suggested that Chivers move in with her sister, who lived in Oregon. This suggestion was made to reassure Chivers that she could report Gillespie to the School and, if she still felt uncomfortable attending the school, could get away from the situation.

Monday, October 6 was the first time that Chivers herself told Wellman about Gillespie. (It is also the first notice that Chivers believes the School had; she does not believe that Wellman was notified on October 3). Dawn Ramsey, the School's nurse, was also present when Wellman spoke to Chivers. Chivers informed Wellman that she was withdrawing from the School. When he asked her why she wanted to withdraw, Chivers reported that Gillespie was having conversations with her at tennis practice and over the internet that made her uncomfortable. Chivers's characterization of Wellman's response to this information differs somewhat from Ramsey's and Wellman's. Chivers contends that Wellman accused her of making statements about Gillespie because she wanted to move in with her sister. She states that he asked if she kept a printout of any of the conversations and told her that he needed proof of Gillespie's conduct, such as a printout of an IM conversation. He even suggested that she get Gillespie to IM her and say the same types of things he had been saying. Chivers contends that Wellman said he could not do anything about Gillespie, especially without proof.

Ramsey testified that Wellman asked questions to try to find out what was happening and encouraged Chivers to stay at the School because he believed she was an asset to the school. She also testified that the reason Chivers stated she wanted to leave the School was because she did not want any rumors started about her. Wellman testified in his deposition that he asked Chivers if she could get him any evidence or something to support what she was saying because it would be helpful. He contends, however, that he did not tell Chivers that he needed proof before he could do

anything. He also did not tell her that there was nothing he could do about Gillepsie. Mr. Chivers also testified that he did not recall Wellman saying anything of that nature.

In fact, during the week of October 6–10, the School, through Wellman and the Superintendent, Dr. George Stone, contacted the Division of Family and Children and the Noble County Prosecutor's Office. They also requested that the Information Technology Director for the School inspect Gillespie's school computer, which uncovered no evidence of improper usage as it related to Chivers. During this week, Wellman attempted to speak to Chivers's mother. She returned his telephone messages on October 9. Mrs. Chivers did not want to talk with anyone from the School and indicated that she had contacted the Allen County Prosecutor's Office and a rape crisis center. During this week, Mr. Chivers called the School to report Chivers' excused absences.

On Friday, October 10, Chivers completed the appropriate papers to withdraw as a student from the School. The record is not clear whether the withdrawal form was provided to the School on the 10th, the date it was signed, or on October 13, the next Monday. On Saturday, October 11, Gillespie and Chivers had another IM conversation. Mr. Chivers was observing the conversation and because he and Chivers both wanted proof of Gillepsie's inappropriate actions, they kept the exchange going.

Gillespie started the IM conversation by saying that he was sorry to hear that Chivers was leaving and that he would miss her. During the conversation, Gillespie informed Chivers that he was having a party at his house for the Cubs game. He said he would invite her as a going away present, but that she would probably not have fun with his friends. When Chivers responded that it sounded like he had an exciting night coming, Gillespie responded, "I'd probably have more fun with you . . . if that tells you anything." He indicated that she would have to come over and between the two

10

of them they could show his friends how to have some fun. When Chivers wrote that Gillespie would have to find a replacement when she left, he responded, "buy you never came down." She clarified that she meant as a manager for the tennis team. Gillespie said they would need a "cute girl" because it "keeps the guys coming back."

Chivers attempted to get Gillespie to tell her what he thought of her. Gillespie responded that he was not allowed to say, because MSN conversations could be seen, and that he only took chances "in person." When she advised him that she was no longer a student at the School, he said that he had friends over, "but they won't be here all night." Chivers pressed Gillespie to tell her what he thought of her and he wrote, "I think you're awesome." When she pressed for more specifics, he said that she would be "very complimented." As to what he would like to see happen, Gillespie responded, "I'm not really in a position to say what I'd like to see happen . . . I'm only in a position to react to what is presented to me." He wrote that he could not ask her to do anything, but that it did not mean that he would say no if she asked. Chivers asked Gillespie if he found her attractive; he responded, "yes." Chivers asked whether he wanted her to "come over later tonight when your friends are gone?"; he responded, "yes." When Chivers asked what they would be doing, Gillespie wrote, "whatever you want." Chivers then said she had to go, but asked Gillespie for his cellular phone number. He hesitated, "for the obvious reasons" but said she could see it online by clicking on his name and choosing properties. She asked Gillespie if he wanted her to call that night and he responded positively, but stated that he could not always have what he wanted. He then said, "but in the right circumstance . . . I'm sure I could trust ya enough to go down that road." When Gillespie expressed his nervousness, because he had never had a conversation like this, Chivers commented that it was not any different from all their other conversations. Gillespie responded, "other than you

11

coming over." Chivers wrote that even that had been discussed before and Gillespie wrote that he was never able to "read" her. Gillespie expressed his fear of getting in trouble and Chivers asked why, saying that he had not done anything wrong. Gillespie responded, "true," "yet," "but I'd let you come over . . . that oughta tell you something." He said he would not even consider it if he did not think very highly of her because even if nothing went on, he would still get in trouble. Gillespie asked for Chivers "take on everything" before she insists that she has to go and, before they end the conversation, Gillepsie wrote, "just ensure me I'm not getting my ass in a sling."

On Monday, October 13, Chivers provided Wellman with a printout of the Saturday, October 11 IM session she had with Gillespie. Either on this date or the previous Friday, Chivers also provided Wellman with her written summary of the events that occurred before October 6.

In the summary, Chivers contends that Gillespie used "Peter . . . Peter Guzinya" as a screen name. "Some people call me the gansta of love," "you're legs must be tired because you've been jogging through my mind all day," and "wanna spank my monkey" were also referenced in Chivers's summary under the heading of "screen names." In one of the first conversations that Chivers believed to be inappropriate for a teacher to have with a student, Gillespie talked at length about his relationship with his ex-fiancee and the emotional distress their break-up caused him. Chivers contends that Gillespie asked her to tell him anything she knew about his ex-fiancee, who she knew to be the cousin of one of her friends, in exchange for bonus points toward her grade and candy (which Gillespie handed out frequently) during class.

During tennis one night, when Chivers was leaving to go to work, Gillespie requested that Chivers bring him some food from her workplace to make up for missing tennis. Later that night, Chivers told Gillespie, through IM, that she got him some chicken. He said that he was excited to

12

have it for lunch. Chivers informed him that she would not be in school the next day because she

had an orthodontist appointment. Gillespie responded that he was hungry right then and wished that

she could bring the chicken to him and wished that it was not too late to come get the chicken or

have her bring it to him. He then suggested that he could miss school the next day and she could

bring the chicken to his house (in Fort Wayne) because she was going to be in Fort Wayne for her

appointment anyway. She stated that she would just drop it off at school on the way to Fort Wayne.

Gillespie told Chivers that she should feel privileged to be able to bring him the chicken during his

prep period because he only let special people visit him during that time.

During one late night IM session, Gillespie stated that a friend he had over at his house

requested Gillespie to get some girls over. Chivers stated that she was seventeen and his student and

Gillespie responded that his friend did not care and really wanted her to come over. She declined

and offered her trigonometry homework as an excuse. Gillespie then stated that he would do her

homework for her. Later that night, Gillespie told Chivers that he loved to have "late night visitors,"

that he needed a late night visitor and had not had one in a long time. Chivers told Gillespie that she

would come if her friend, Joe Brown, who was at her house, could come too. Gillespie insisted that

Chivers come alone and stated that he trusted her because if the school found out about his

conversations with Chivers, he could lose his job.

Chivers recalls in her summary that on another night, Gillespie wanted to compare partying

stories and rebellious things they had done. Gillespie insisted that he did worse things than Chivers;

things that would absolutely shock her, but that he could not tell her about them because he was a

teacher.

Chivers contends that Gillespie asked her for a picture so that he could "rate" her on scale

13

of 1–10, similar to the rating conducted on the hotornot.com website, where Gillespie's picture was posted. Chivers recalls that Gillespie gave her a 9 out of 10. Gillespie sent Chivers a picture of himself performing a mock strip tease during a wedding reception, the same photo that was posted on the website. Chivers also recalls that Gillespie sent her two dirty cartoons, one called "Look at My Monkey" portraying a masturbating monkey.

Gillespie told Chivers one night that he was still at school with some of the tennis players watching the movie "Joe Schmoe." He told her that the movie was almost over, but that if she wanted to come to the school she could watch the end of it and then help him grade tests when the players left. When Chivers asked if she could grade her own test, Gillespie said no, but that he would give her bonus points if she graded the rest of the tests. Chivers declined and Gillespie graded her test online. Chivers said she would grade tests in the morning for bonus points, but Gillespie declined.

Chivers recalled other comments by Gillespie: he asked her when she turned eighteen; he said that she had a great personality and if her older sister was anything like her, that he knew he would get along great with her; he said he liked dating younger girls; he stated that if he could find a girl exactly like Chivers who was his age, he would have found the perfect woman for himself; he stated on several occasions, that he trusted Chivers to be able to talk to her because he knew he could get in a lot of trouble if she told anyone about their conversations; he asked Chivers whether she was cheating on her boyfriend with her friend Joe Brown.

Chivers also indicated in the summary that Gillespie pulled up her personal records online and told her he could see her parents' names, addresses, phone numbers, and places of employment as well as her age, class rank, and other personal information.

14

One event Chivers included in the summary did not involve the computer. The tennis team was returning to school after a match and talked about lifting weights together. Chivers expressed an interest in lifting with the team as she had done on one prior occasion. It turned out that, after returning to school, none of the players wanted to lift weights but Gillespie asked Chivers if she still wanted to lift weights with him. Not wanting to be alone with Gillespie, Chivers said that she did not.

On October 15, Detective Kathy Robbins of the Indiana State Police and Rosie Johnson of the Noble County Prosecutor's Office interviewed Chivers. The State Police and Prosecutor's Office determined that Gillespie did not commit any criminal acts or offenses and informed Wellman and Stone of their conclusions. Wellman met with Chivers and her father after the police interview. By this time, the School had contacted its legal counsel regarding its course of action and was relying on the advice of counsel. The advice centered around investigating the allegations and, once they were substantiated, whether to terminate Gillespie or take some other disciplinary action.

On October 19, Chivers moved to Oregon to live with her sister and was enrolled in a new high school by the end of October.

On October 21, Dr. Stone and Wellman met with Gillespie to discuss his behavior. Gillespie admitted having internet communications with Chivers of a personal nature, including the October 11 conversation. On October 31, the School issued a reprimand to Gillespie as a result of their investigation and the documents provided by Chivers. Gillespie was "warned and reprimanded for engaging in an inappropriate dialogue with a Central Noble High School student while [he was] a faculty member at that school." Gillespie was told that his conduct jeopardized his continued employment with the School. The reprimand was placed in his personnel file. Since October 2003,

15

there have been no allegations, complaints, or rumors against Gillespie of inappropriate conduct with a student.

Chivers testified that there was nothing the School could have done to convince her to stay as a student other than firing Gillespie because she would not have felt comfortable attending the School unless he was gone. Mr. Chivers testified that he expected the School to isolate his daughter from Gillespie and make arrangements for her to receive math instruction some other way. He did not communicate this specific expectation to the School and the School did not offer any such solution.

Chivers testified that she could not concentrate in class and that her attendance and grades suffered as a result of Gillespie's conduct. She decreased her participation in class so as not to attract unwanted attention. She testified that, on at least one occasion, she believed she received more credit on a test than she was actually entitled to. She claims that she did not seek help after school because she did not want to be alone with Gillespie and that she skipped a tennis match and then hid from Gillespie when he drove past the truck she was sitting in with her boyfriend. There is also credible evidence that, after reporting Gillespie's conduct, Chivers threatened to commit suicide.

The School never informed Chivers of its reprimand to Gillespie, but she heard about it through other parties. Chivers returned to Fort Wayne in early June 2004 but did not return to the School, where she wanted to be with her friends, because Gillespie was still a teacher there. She completed her high school education in December 2004 at Snider High School.

During the 2002-2003 school year, there was a rumor that Gillespie had been overly familiar with a student, Sandy Price. The rumor was investigated and found to have no merit. The School did determine, however, that Gillespie's e-mail communication with Ms. Price about her homework

16

assignments had the possible appearance of impropriety and that he should not communicate with students through the internet.

**DISCUSSION**

A.      **Title IX**

Title IX prohibits sex discrimination in educational programs or activities supported by federal grants. 20 U.S.C. § 1681(a). The only remedy specified in the statute is the elimination of federal funding, § 1682, but in *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979), the Supreme Court held that the statute by implication entitles a person injured by a violation to sue for damages.  A plaintiff must establish sexual harassment of a student that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the student's educational experience, that the student victim is effectively denied equal access to an institution's resources and opportunities. *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999); *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist., 163*, 315 F.3d 817, 823 (7th Cir. 2003) (citing requirement that action be severe, pervasive, and objectively offensive sexual harassment that had a concrete, negative effect on the student's access to education).

A recipient of federal funds, however, may be liable in damages under Title IX only for its own misconduct. *Davis*, 526 U.S. at 640–41. Therefore, when the claim for damages is based on the behavior of a teacher toward a student, the plaintiff must prove that "an official of the [defendant educational institution] who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). The response must amount to deliberate indifference

17

to discrimination. *Id.* at 290. As long as the school's response is not "clearly unreasonable," it cannot have acted with the requisite deliberate indifference to incur Title IX liability. *Davis*, 526 U.S. at 648–49. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649 (stating that this is not a mere "reasonableness" standard).

### 1.      *Sufficiently Severe or Pervasive*

The Seventh Circuit has endorsed looking to Title VII law to determine whether the alleged sexual harassment is sufficiently severe or pervasive to constitute illegal discrimination on the basis of sex under Title IX. *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684, 2004 WL 1873222, at *4 (7th Cir. Aug. 19, 2004); *Smith v. Metro. Sch. Dist. Perry Twp.,* 128 F.3d 1014, 1023 (7th Cir. 1997). Whether gender-oriented conduct rises to the level of actionable harassment in Title IX cases "'depends on a constellation of surrounding circumstances, expectations, and relationships,'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998), including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651 (parallel citation omitted). "The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653.

The School argues that because Chivers stopped attending classes on October 3 and told Wellman that she would not come back to school with Gillespie there, the School no longer had a duty to protect her from sexual harassment, unless she returned to school. The School argues that

18

any activities of Gillespie that occurred after October 3 cannot form the basis for a hostile environment claim. They also assert that she was officially withdrawn from the school before the October 11 IM, which occurred while Chivers and Gillespie were away from school on their home computers, a situation over which it had no control.

The Court finds that the events occurring after October 3, including the October 11 IM should be included in its analysis of whether Chivers's educational environment was hostile. At all times, Gillespie, the harasser, was under the School's disciplinary authority. The School had the ability to discipline Gillespie for his actions occurring after October 3 and indeed, did discuss the October 11 IM in its meeting with him. In addition, the School had a duty to guarantee equal access to educational benefits even when Chivers's status as a student was uncertain. That she was not sure she wanted to continue her education at the School was only due to the situation created by Gillespie's gender-related conduct and the School's response to it.

The School also argues that Chivers was not offended by Gillepsie's conduct. As evidence, it contends that she turned him down, called him a dirty old man, enjoyed receiving a certain amount of favoritism, and suffered no negative consequence to her math grade or otherwise. Other than the comment regarding favoritism, the Court is not sure how these things demonstrate that Chivers was not offended by Gillespie's conduct. Additionally, the reference to favoritism only addressed the classroom aspect of Gillespie's conduct and Chivers testified that she eventually became uncomfortable by his preferential treatment and stopped participating in math class because of it. There is sufficient evidence to allow a jury to determine whether Chivers was offended by Gillespie's conduct. She reported the conduct as inappropriate, at first to her friends and family and then to the School. She also testified that she would sometimes block his messages and she never

19

placed herself in a situation where she was alone with Gillespie. Eventually, Chivers refused to return to school while Gillespie was still there.

The Seventh Circuit has said, and this Court agrees, that "[i]t goes without saying that sexual harassment in the workplace is vastly different from sexual harassment in a school setting." *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1226 (7th Cir. 1997) (finding that welcomeness is not an appropriate inquiry in Title IX cases where elementary students are involved).

> The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace, as students look to their teachers for guidance as well as for protection. The damage caused by sexual harassment also is arguably greater in the classroom than in the workplace, because the harassment has a greater and longer lasting impact on its younger victims, and institutionalizes sexual harassment as accepted behavior. Moreover, as economically difficult as it may be for adults to leave a hostile workplace, it is virtually impossible for children to leave their assigned school. Finally, a nondiscriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that a student receives. A sexually abusive environment inhibits, if not prevents, the harassed student from developing her full intellectual potential and receiving the most from the academic program.

*Id.*

With this in mind, the Court finds that the appropriate standard in this case is not that of a reasonable adult in the workplace, but of a reasonable teenager in a school setting. While none of the comments were physically threatening, hostile, or intimidating, they did evidence Gillespie's desire to establish a sexual relationship with Chivers. The Court must be cognizant that manipulation that might not impact a peer can become a tool of harassment for a teacher in the teacher-student relationship.

The Court finds that a reasonable jury could conclude that Gillespie pursued Chivers in hopes of establishing a sexual relationship. The nature of Gillespie's comments regarding late night visitors, asking her to come over, saying that he only took chances in person, commenting that he

20

was only in a position to react to what was presented to him, and other comments could support such a conclusion.

A jury could also conclude that this pursuit, by a person with authority over Chivers, so undermined and detracted from her educational experience that she was effectively denied equal access to the School's resources and opportunities. Chivers decreased her participation in class, did not seek help in math even though she needed it, and had falling grades and poor attendance. She also felt trapped into continuing to converse with Gillespie for fear that he could affect her grade and other students' perceptions of her. Chivers eventually stopped going to school altogether as a result of the circumstances created by Gillespie's conduct. Whether Gillespie's personal communication with Chivers and his repeated invitations for Chivers to be alone with him at night, either at school or at his apartment, in conjunction with the sexual nature of his screen names, the dirty cartoons, and the request for a picture to rate her as "hot or not," were sufficiently egregious to support a claim for a hostile environment is a question for the finder of fact.

### 2. School's Response

Even if Gillespie's conduct was sufficiently severe, the School cannot be held liable under Title IX if its response to the known instances of harassment was not clearly unreasonable in light of the know circumstances. *Gebser*, 524 U.S. at 290; *Gabrielle M. v. Park-Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d at 824.

Chivers argues that the School did not take prompt action because it first wanted written proof from Chivers. In fact, according to Chivers's version of events, Wellman suggested that, because Chivers did not have any proof, she should get Gillespie to IM her again so she could print

21

it out as proof of what Gillespie was doing. Chivers also contends that Wellman suggested that Chivers was only accusing Gillespie so she could move to Washington to live with her sister.

If the School had stopped right there and not taken any action on Chivers's complaint, its response may have been deliberately indifferent under Chivers's version of events. However, it is undisputed that after Chivers orally reported that Gillespie engaged in conversation that made her uncomfortable, Wellman contacted the Superintendent and they contacted outside law enforcement agencies—even before receiving Chivers' summary of conduct or the printout of the October 11 IM conversation. The School also conducted an investigation of Gillespie's computer at school and remained in contact with Chivers's parents regarding the situation and the School's investigation and response. Wellman also arranged for Chivers to be interviewed by the Indiana State Police.

Chivers contends that because Wellman did not give her any assurances that Gillespie would be terminated, she decided not to come back to school and requested that Wellman wait to confront Gillespie until after she was gone. The School submits that it simply honored Chivers' request when it waited until October 21 to talk to Gillespie. It also argues that Chivers's request proves that she had already decided to move when she voiced her complaint to Wellman. In essence, the parties dispute whether it was appropriate for the School to operate under the assumption that Chivers did not want to return to the School, or whether it should have taken steps to allow her to attend school without having any contact with Gillespie, either because he was already fired or otherwise.

The Court finds that even if the School's assumption regarding Chivers's intentions was erroneous, it was not deliberately indifferent to the allegations of harassment. The Court does not suggest that reasonable persons could not differ as to how the matter should have been handled or that the School's response was ideal. While it may have been preferable for the School to

communicate to Chivers that there were ways to keep her enrolled and isolated from Gillespie, this was not a case, as it was in *Davis*, of a school making "no effort whatsoever either to investigate or to put an end to harassment." *Cf. Davis*, 526 U.S. at 654. Although the School could have arguably done more, the Defendants' actions were not clearly unreasonable in light of the known facts. *See Hendrichsen*, 107 F. App'x at 685 (noting that plaintiff's arguments that she wished school had done more did not explain why what it did do could be considered clearly unreasonable). The fact remains that Chivers had already expressed her desire to withdraw from school, mainly because of her concern that she would be ostracized by other students. She took steps that demonstrated her intention to follow through on this action. Although the Court can speculate that a different response from the School may have changed Chivers's actions and her adamance that she was not returning to the School, and been more sensitive to her position, its response did not amount to an official decision not to remedy the situation. *Cf. Chontos v. Rhea,* 29 F. Supp. 2d 931, 934 (N.D. Ind.1998) (quoting *Gebser* for the proposition that "an agency may sanction a funds recipient when the proper official 'refuses to take action,' in other words, when there is 'an official decision by the recipient not to remedy the violation'").

By arguing that the discipline was not swift (or severe) enough, the Plaintiff is essentially asking this court to "second guess" the School's decisions. That is not the Court's role. This Court's role is to determine whether, based upon all of the facts presented in this case, there is a genuine issue of material fact regarding whether the School's response was clearly unreasonable. *Davis*, 526 U.S. at 648 (admonishing that "courts should refrain from second-guessing the disciplinary decisions made by school administrators); *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 934 (C.D. Ill. 2002). Because Wellman's response did not amount to deliberate indifference,

Wellman and the School are entitled to summary judgment on Chivers's Title IX claim and that claim is dismissed in its entirety.

**B.      Section 1983 Claim Against Gillespie**

Chivers invokes § 1983 to sue Gillespie for violating her equal protection rights. The Seventh Circuit recognized the potential for such a cause of action against a teacher in *Delgado v. Stegall*, 367 F.3d 668, 674 (7th Cir. 2004) (holding that Title IX remedies did not foreclose student's claim against state university professor under § 1983). To state a valid cause of action under § 1983, a plaintiff must demonstrate that: (1) the defendant deprived her of a right secured by the Constitution or any law of the United States; and (2) the deprivation of that right resulted from the defendant acting under color of law. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

*1.      Deprivation of Right Secured by Constitution*

Just as sexual harassment is sex discrimination for Title VI purposes, it is also sex discrimination for purposes of the equal protection clause of the fourteenth amendment. *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986). However, in § 1983 cases for violation of equal protection, unlike in Title VII cases, the plaintiff must establish intent to discriminate based on gender. *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990) (holding that, in equal protection cases, unlike in Title VII cases, intent to discriminate must be shown). "Thus, a plaintiff wishing to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens—i.e., male or female." *Id.* Gillespie contends that Chivers cannot establish that his

24

conduct was sufficiently severe or pervasive to create a hostile environment or that he intended to discriminate against her on the basis of her gender. The Court disagrees and finds that there is sufficient evidence from which a jury could conclude that Gillespie's actions created a sexually hostile educational environment and deprived Chivers of her constitutionally protected right to equal protection.

Although the Court agrees that there is not evidence of physical contact, the Court does not agree with Gillespie's characterization that the IM exchanges were, "at worst, flirtatious or suggestive." Even if they were only characterized as such, flirtatious or suggestive exchanges have, as discussed more fully above, a different meaning among peers than they do to a seventeen year old student from her teacher. And while Chivers testified that Gillespie never talked her into doing anything against her will, the fact that she did not accommodate his requests for her to visit him at his apartment or late at school does not take away the fact that a jury could determine that Gillespie inappropriately pursued Chivers for a sexual relationship that undermined her educational experience.

Challenging the intent element, Gillespie contends that Chivers was not discriminated against because of her gender if Gillespie only sent instant messages to her because of a personal attraction. Intent is an essential element of a claim for violation of the Equal Protection Clause. *Huebschen v. Dept. of Health and Social Servs.*, 716 F.2d 1167, 1171 (7th Cir. 1983) ("A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual."). Gillespie relies on *Trautvetter* to assert that this required element is missing in this case. In *Trautvetter*, the court asked whether the defendant's sexual advances toward the plaintiff were

"because of" her status as a woman or, in the alternative, whether those advances were inspired by characteristics, albeit some sexual, which were personal to the plaintiff. 916 F.2d at 1150. The court determined that there was nothing in the record to indicate that the defendant's feelings were based on anything but personal attraction to the plaintiff. *Id.* at 1152; *see also Huebschen*, 716 F.2d at 1172 (finding that the defendant's gender was merely coincidental to the plaintiff's actions because the group that the plaintiff sought to have romantic affairs with consisted only of the plaintiff and the defendant's animus was toward the defendant as a "former lover who had jilted her"). Gillespie uses this same analysis to contend that, if even Chivers's allegations are true, his conduct was the result of personal attraction, not intentional discrimination based on Chivers's membership in a protected class.

Therefore, the Court must determine whether Gillespie's harassment was because of sex or whether it was merely in spite of her gender. *Huebschen*, 716 F.2d at 1171 ( "The decisionmaker must have selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects *upon an identifiable group*.") (citations and alterations omitted). The Court finds the facts of this case distinguishable from *Huebshen* and *Trautvetter*. It is not insignificant that the claims in *Huebshen* arose out of a failed office romance and in *Trautvetter*, the principal of a school courted a teacher for an intimate relationship that the parties eventually consummated and maintained for some time before the plaintiff claimed that she was pressured into the relationship. In explaining the distinction between an intent to discriminate because of a plaintiff's status as a female versus because of characteristics of her gender which are personal to her, the *Trautvetter* court explained:

> If this distinction—subtle as it is—is not maintained, any consensual workplace romance involving a state supervisor and employee which soured for one reason or

> another could give rise to equal protection claims if the employee simply alleges that his or her supervisor's conduct during the term of the romance constituted "sexual harassment." Such a scenario constitutes precisely the type of claim which the equal protection clause's "intent to discriminate" requirement was meant to discourage.

*Trautvetter*, 916 F.2d 1140, 1151 (7th Cir. 1990).

The Court also finds guidance in *Volk v. Coler*, 845 F.2d 1422, 1433 (7th Cir.1988), where the Seventh Circuit distinguished its holding in *Huebshen* because the plaintiff's testimony depicted an abusive environment in which she was allegedly victimized against her will, not one in which a consensual romance disintegrated. The court stated that "[d]iscrimination and harassment against an individual woman because of her sex is a violation of the equal protection clause." *Id.* The plaintiff's sex was an immutable characteristic and even if the defendant "did not choose to offend all women with whom he had contact, the law does not require such uniform treatment." *Id.* The Seventh Circuit has specifically rejected the argument that harassment based on sexual desire is not based on gender. *See King v. Bd. of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 539 (7th Cir. 1990) (citing *Volk v. Coler*, 845 F.2d 1422, 1433 (7th Cir.1988) and *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir. 1986)). In *King*, the defendant claimed that it was the plaintiff as an individual to whom he was attracted, not the plaintiff as a woman. The court found that this argument missed the point: "[The defendant] wanted to have an affair, a liaison, illicit sex, a forbidden relationship. His actions are not consistent with platonic love. His actions were based on her gender and motivated by his libido." *Id.* The court noted that it rejected similar arguments in quid pro quo harassment cases where a supervisor demands sexual favors as a condition of employment:

> This is exactly the situation where a supervisor's only motivation is to have a conjugal relationship with the employee. In *Horn v. Duke* we considered the argument that the quid pro quo demands based on sexual desire were not based on

27

> sex. 755 F.2d 599, 604 (7th Cir.1985). We found that "[b]ut for Horn's womanhood, Haas would not have demanded sex as a condition of employment. Because of her sex, therefore, Horn was disadvantaged by pressure to submit to an additional, humiliating condition of employment that served no legitimate purpose of the employer." *Id.* In other words, treatment of individual based on sexual desire is sexually motivated. Sonstein's sexual desire does not negate his intent; rather it affirmatively establishes it.

*Id.*

The Court finds that Gillespie has not established, as a matter of law, that his actions were motivated by factors other than Chivers's gender and his desire to have a sexual relationship with her as a female. *See King*, 898 F.2d at 539 (clarifying that the "theme of *Huebschen* is that disparate or harassing treatment is not sexually discriminatory if there is a cause other than gender" such as personal incompatibility). There is sufficient evidence to present the jury with the issue of whether Gillespie's actions were gender-based harassment.


**2.**     ***Under Color of State Law***

Gillespie contends that Chivers cannot establish that he was acting under color of state law when the alleged harassment occurred. He argues that none of the conduct took place during school hours or during school functions and Chivers did not suffer negative consequences from Gillespie in his capacity as a teacher.

In *West v. Atkins*, 487 U.S. 42, 49 (1988), the Supreme Court explained that to be "acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"(quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The Court further noted in *West* that "[i]t is firmly established that a defendant in a § 1983 suit acts under color

28

of state law when he abuses the position given to him by the State." *Id.* at 49–50.

Because the Seventh Circuit has not specifically addressed when a teacher has acted under color of state law, this Court looks to other circuits for guidance. *See Becerra v. Asher*, 105 F.3d 1042 (5th Cir. 1997); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994); *D.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176 (10th Cir. 1990).

In *D.T. v. Indep. Sch. Dist. No. 16* and *Becerra v. Asher*, the reviewing courts determined that the defendant teachers did not act under color of state law when they engaged in the activity alleged to have violated the plaintiffs' constitutional rights. The state actors in these cases became acquainted with or befriended the plaintiffs pursuant to their official duties. However, in *D.T.*, the teacher molested students during summer vacation at his home following a fund-raising activity for a basketball camp that was not affiliated with the school and when he was not officially working for the school district. 894 F.2d at 1186–88. In *Becerra*, there was no nexus between the teacher's official duties and his sexual assault of a student at the student's home more than five months after the student withdrew from the school. 105 F.3d at 1047.

The facts in *Doe v. Taylor* stand in contrast:

> Stroud took full advantage of his position as Doe's teacher and coach to seduce her. He required Doe to do little or no work in the classroom and still gave her A's. He also spoke to one of Doe's other teachers about raising her grade in that class. Stroud was also Doe's basketball coach and he exploited that position as well. The first physical contact Stroud had with Doe was after a basketball game in November 1986 when he grabbed her and kissed her. Stroud's physical contact with Doe escalated thereafter. During the next several months Stroud took Doe from his classroom to an adjoining lab room where he kissed and petted her. During that same period of time Stroud also met Doe in the school's fieldhouse where similar activity took place.

> As the court in *D.T.* recognized, if a "real nexus" exists between the activity out of which the violation occurs and the teacher's duties and obligations as a teacher, then the teacher's conduct is taken under color of state law. [894 F.2d] at 1188. As demonstrated by the above facts, the nexus that was missing in *D.T.* was clearly

29

present in this case. We therefore reject the school officials' argument that Stroud's
acts were not under color of state law.

*Doe v. Taylor,* 15 F.3d at 452 n.4.

Although this case falls somewhere between *Doe,* at one end of the spectrum, and *D.T.* and
*Becerra* at the other, this Court finds that there is a question of fact whether there was a real nexus
between Gillespie's conduct and his obligations as a teacher such that he was acting under color of
state law for purposes of Chivers's § 1983 claim. Unlike in *D.T.* and *Becerra,* he was actively
engaged in teaching Chivers during the same time that he engaged in the alleged misconduct. He
was her teacher before, during, and (if she had stayed at the School) after the harassment. *Becerra*,
105 F.3d at 1047 (stating that "[u]nlike in *Doe,* Asher was not Juan's teacher 'before, during, and
after' the sexual abuse, nor was this wrongful conduct 'on and off school grounds'"). His official
interactions with Chivers and his sexual pursuit constituted an "indivisible, ongoing relationship"
even though a significant amount of the sexual misconduct occurred after hours and off school
grounds via personal computers. *Doe v. Taylor*, 15 F.3d at 461 (Higginbotham, J., concurring).
Chivers testified that the fact that Gillespie was her teacher led her to believe that she could not
simply ignore, or block, his instant messages without consequence. Had a total stranger been
contacting her, she would not have felt the same pressure because there would not have been any
fear of repercussion to her grade or her standing with her peers. Gillespie also used his position of
authority to suggest that Chivers could get bonus points in his class by helping him grade tests—late
at school alone with him. Chivers testified that he gave her more points on one of her tests than she
actually deserved and that she tried to avoid unwanted attention in class. Gillespie also suggested
lifting weights with Chivers after tennis even though he knew none of the other players were going
to lift. Gillespie's involvement with the School's tennis team, of which Chivers was a student

30

manager, was certainly part of his official duties. Gillespie also made reference to visiting him during his prep period at school.

Chivers's § 1983 claim is not foreclosed for failure to establish that Gillespie was acting under color of state law.

### 3.       *Qualified Immunity*

Gillespie contends that he is entitled to qualified immunity.

Under United States Supreme Court precedent, the analysis of a qualified immunity defense requires a two-step inquiry.  First, a court must answer the threshold question whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, assuming that a plaintiff is able to establish a constitutional violation under a favorable view of the facts, "the next, sequential step is to ask whether the right was clearly established." *Id.* In other words, a court must consider whether the law clearly established that the defendant's conduct was unlawful in the circumstances of the case. *Id.*

The Court has already determined that there is sufficient evidence to proceed to the jury with the question whether Gillespie's actions violated Chivers's constitutional right to equal protection. The Court also finds that the contours of the right to be free from sexual harassment, which constitutes intentional discrimination based on gender, in the educational setting are sufficiently clear that a reasonable teacher would understand that when he pursues a student for a sexual relationship, he violates that right. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (describing "clearly established" requirement of qualified immunity). Although it is not required that the very

31

action in question has previously been held unlawful, the unlawfulness must be apparent in light of pre-existing law. *Id.*

Here, Gillespie should have known that his communications with his student were not only improper (it appears that he did realize as much), but also had the effect of discriminating against her on the basis of her gender. Gillepsie's assertions that his computer contact was, at worst, flirtatious or suggestive and that none of the alleged conduct took place at the school is not based on a view of the facts most favorable to Chivers. His notation that she was seventeen years old, and over Indiana's legal age of consent, does not convince this Court that her right to be from harassment based on gender was any less clearly established. The Equal Protection Clause is not age specific.[2]   Gillespie is not immune from suit for violation of Chivers's equal protection rights and her § 1983 claim may proceed to a jury.

**C.   State Law Claims**

*1.   Negligent Retention and Supervision*

In Count II of her Amended Complaint, Chivers alleges that the School and Wellman were negligent in their retention or supervision of Gillespie. The Defendants argue that summary judgment is appropriate on this claim because they did not know or have reason to know about misconduct by Gillespie and did not fail to take appropriate action.

"Indiana has long recognized a cause of action for negligent hiring and retention of an

---

[2] If Gillespie intended to argue Chivers's age as additional proof that his conduct did not create a sexually hostile environment, it would also fail. As previously stated, there is sufficient evidence in the record to allow a jury to determine that issue. It is also noteworthy that Indiana's child seduction statute, Ind. Code § 35-42-4-7, applies to children seventeen years of age.

32

employee." *Levinson v. Citizens Nat'l Bank of Evansville*, 644 N.E.2d 1264, 1269 (Ind. Ct. App. 1994). Indiana has adopted the Restatement (Second) of Torts § 317 as the standard with regard to this tort. *Konkle v. Henson*, 672 N.E.2d 450, 454 (Ind. Ct. App.1996). Under this standard, the court must determine if the employer exercised reasonable care. *Id.* at 455.

To prevail on this theory, the plaintiff must show that the defendant employer negligently retained an employee knowing that the employee was in the habit of misconducting himself. *Levinson*, 644 N.E.2d at 1269; *see also Grzan v. Charter Hosp. of Nw. Ind.*, 702 N.E.2d 786, 793 (Ind. Ct. App. 1998) (stating that the plaintiff must show that the defendant knew or had reason to know of employee's misconduct and failed to take appropriate action). Chivers argues that the School knew about Gillespie's prior improper internet communications with another female student, Sandy Price, and knew about his communications with Chivers, but failed to take appropriate action. Chivers contends that even without knowledge of Sandy Price, the Defendants' response to her situation alone gives rise to a claim for negligent retention and supervision.

The Plaintiff's allegation of an unsubstantiated rumor of previous misconduct and her argument of an inadequate response to her own complaint do not support a claim for negligent retention and supervision of an employee who was known to be in the habit of misconducting himself. In the two cases cited by Chivers in support of her claim for negligent retention and supervision, the defendants had engaged in prior incidents of known harassment. In *Chontos v. Rhea*, by the time the incidents involving the plaintiff occurred, the harasser had established a pattern of behavior that was not addressed by the university, despite a previous warning to him that future behavior could result in being fired. 29 F. Supp. 2d 931, 935–37 (N.D. Ind.1998) (noting that before the incident with the plaintiff, the defendant had gained a reputation for making females

33

uncomfortable in his presence and patting them on the buttocks, stalked a female graduate student and physically assaulted her in her home, touched a high school girl on the buttocks then invited her to his office, and been the subject of special scheduling and furniture arrangements designed to diminish his opportunity to bother females).

In *Matheny v. Reid Hospital & Health Care Services, Inc.*, 2002 WL 655702, at *11 (S.D. Ind. Mar. 12, 2002), an unpublished opinion, the court denied summary judgment on the plaintiff's negligent retention claim when it found that the plaintiff raised genuine issues with respect to the appropriateness of the defendant's response to her complaints of harassment, especially "in light of the multiple, prior complaints regarding [the alleged harasser's] similar conduct." In discussing the employer's liability under Title VII, the court found that "[a] reasonable trier of fact could find that [the employer's] response was inappropriate given [the harasser's] history and [the employer's] knowledge that he had made inappropriate comments to other women as well as his recent unwelcome and inappropriate touching of [the plaintiff]." *Id.* at *8.

Here, the Defendants had no reason to know that Gillespie would engage in the activities he did with Chivers. He did not have a history of such conduct nor did he display behavior that would have revealed a propensity for such behavior. Chivers makes much of the fact that Gillespie was previously warned for communicating with a student, Sandy Price, via the internet. However, there is no evidence that his communication with Ms. Price was of a sexual nature. In fact, an investigation of a rumor that Gillespie was overly familiar with her led the Defendants to conclude that there was no inappropriate behavior, just the potential of an appearance of impropriety that exists whenever a teacher communicates with a student by e-mail, even if only to discuss homework assignments. The Defendants are correct when they argue that "Gillespie's communication with a

34

female student regarding her math assignments could not give the School any reason to forsee that [he] would engage in sexual harassment in the future." (Reply at 12.)

Because Gillespie's conduct was not foreseeable, the Defendants cannot be held liable under the tort of negligent retention or supervision and Count II is dismissed.

**2.      *Intentional Infliction of Emotional Distress***

Chivers has sued all of the Defendants for intentional infliction of emotional distress. They seek summary judgment on this claim.

The tort of intentional infliction of emotional distress arises when a defendant (1) engages in "extreme and outrageous" conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) (citing *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind.1997) and Restatement (Second) of Torts § 46 (1965)). As its name suggests, it is the intent to harm another emotionally that forms the basis for the tort. *Id.* (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind.1991)). However, the Restatement of Torts explains that the tort can occur not only where an actor desires to inflict severe emotional distress, but also where he knows that such distress is certain, or substantially certain, to result from his conduct. *Id.* at 691 n.6 (citing Restatement (Second) of Torts § 46 cmt. i (1965)). Such conduct, referred to as "reckless disregard of safety" or "wanton or wilful conduct," is also defined in the Restatement:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

35

*Id.* (citing Restatement (Second) of Torts § 500 (1965)). The Court finds that there is a question of fact whether Gillespie, by his actions toward a student under his authority, acted in reckless disregard for her safety. The same cannot be said for Wellman and the School. Although their response to Chivers's complaint may have been less than ideal, they did not create a risk substantially greater than that which is necessary to make their conduct negligent.

> To be actionable, the actor must not only intend to harm, but the conduct must be
>
> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* at 753 (citing Restatement (Second) of Torts § 46). "What constitutes 'extreme and outrageous' conduct depends, in part, upon prevailing cultural norms and values." *Id.*

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Gable v. Curtis*, 673 N.E.2d 805, 810 (Ind. Ct. App. 1996).   In the appropriate case, whether conduct was extreme and outrageous can be decided as a matter of law. *Bradley*, 720 N.E.2d at 753.

Here, drawing all reasonable inferences in favor of Chivers, a reasonable finder of fact could conclude that Gillespie's pursuit of Chivers was beyond the bounds of decency and went beyond a mere annoyance, triviality, or inconsiderate act that a seventeen year old should be expected to be hardened to. To Chivers, the dilemma created by her teacher's inappropriate communications and attention caused her great distress, to the point of leaving her school completely and talking about

36

suicide.  Because reasonable persons may differ on the questions of whether Gillespie's conduct was extreme and outrageous, he is not entitled to summary judgment on Chivers's claim for intentional infliction of emotional distress. However, Wellman and the School once again prevail as their response, which included contacting outside law enforcement and reprimanding Gillespie within a relatively short time frame, did not go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.

### 3.      Loss of Services

Mr. Chivers has sued the Defendants for the loss of services, society, and companionship of his daughter that he suffered when she moved out his residence and out of Indiana to live with her sister.[3] He argues that he suffered a total loss of his daughter's "physical presence, and their emotional relationship was permanently impacted." (DE 72, Resp. at 25.) The Defendants contend that this claim fails because it is derivative to the other failed claims.

Because no host tort remains against the School and Wellman, Mr. Chivers's loss of services claim also fails against these Defendants. *See, e.g., Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 525 (Ind. Ct. App. 2001) (dismissing loss of consortium claim where host torts were dismissed on summary judgment). He may proceed to trial, however, on his loss of services claim against Gillepsie.

### CONCLUSION AND ORDER

---

[3] In the Amended Complaint, Mr. Chivers actually refers to his claim as one for loss of consortium. The allegations, however, reveal that the appropriate claim is for loss of services. *See Forte v. Connerwood Healthcare, Inc.*, 745 F.2d 796, 801 & n.8 (Ind. 2001) (noting the differences between claim for loss of services and loss of consortium).

For the foregoing reasons, the Motion for Summary Judgment [DE 61] filed by the School and Wellman is GRANTED and all claims against them are dismissed. Gillespie's Motion to Strike [DE 77] is DENIED and his Motion for Summary Judgment [DE 63] is also DENIED.

The following claims remain pending: (1) Plaintiff Alicia Michelle Chivers's § 1983 claim against Defendant Gillespie:(2) Plaintiff Alicia Michelle Chivers's intentional infliction of emotion distress claim against Defendant Gillespie; and (3) Plaintiff Craig Chivers's loss of services claim against Defendant Gillespie.

The Court confirms the status conference scheduled for Monday, March 27, 2006, at 9:00 a.m.

SO ORDERED on March 23, 2006.


 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT